NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| EDWARD S. PATTERSON, | : |
| Plaintiff, | : |
| v. | : Civil No. 08-2725 (RBK) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | : **OPINION** |
| Defendant. | : |

**KUGLER**, United States District Judge:

This matter comes before the Court on an appeal filed by Plaintiff Edward S. Patterson from a decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff disability insurance benefits ("DBI") and supplemental security income ("SSI") pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g). For the reasons expressed below, the Court will vacate the Commissioner's decision that Plaintiff is not entitled to SSI and DBI and remand the matter to the Administrative Law Judge ("ALJ").

**I.   BACKGROUND**

   **A. Procedural History**

Plaintiff filed an application for DBI on August 18, 2004, and SSI on September 22, 2004. (Tr. 61, 94-96, 248). Plaintiff alleged that he became disabled on April 26, 2004, as a result of a motor vehicle accident. (Tr. 159-162). Plaintiff's original application was denied as well as his petition for reconsideration. (Tr. 61-72). On March 1, 2007, Plaintiff appeared before an ALJ. (Tr. 23-60, 73). On April 24, 2007, the ALJ determined that Plaintiff was not

1

disabled. (Tr. 13-21). Thereafter, the Appeals Council denied Plaintiff's request for review. (Tr. 3-5).

### B. Plaintiff's Medical History

Plaintiff is a thirty-eight year old male with a high school diploma. (Tr. 29). At the time of his hearing before the ALJ, Plaintiff stood approximately 6'1" tall and weighed 305 pounds. (Id.). During the hearing, Plaintiff testified that he weighed approximately 250 pounds prior to the motor vehicle accident, and attributed his weight gain to injuries he sustained during the accident. (Id.). He also stated that he gained the weight because he could no longer perform many of the tasks he could perform prior to the accident. (Id.). At the time of the hearing, Plaintiff resided with his mother.

Prior to the onset of his alleged disability, Plaintiff held a variety of jobs that required significant physical exertion. In August 2004, Plaintiff worked for a company called "Casa deCatches." (Tr. 30). That job required him to lift seventy-pound blocks of fish, and other forty-five pound boxes. (Tr. 30). From 1998 to 2000, Plaintiff worked in a meat processing plant lifting heavy meat and performing other physical labor. (Tr. 31). Plaintiff also worked a variety of other jobs that required him to lift more than twenty-five pounds and perform other physically demanding jobs such as cleaning, washing dishes, and lifting trays of dishes. (Tr. 32).

As a result of the car accident in 2004, Plaintiff complains of pain in his spine, shoulder, and neck. (Id.). During the hearing before the ALJ, Plaintiff stated that the pain to his "shoulder and neck area" improved, but indicated that he continued to experience pain in his lower back. (Id.). To ease the pain caused by his injuries, Plaintiff takes "pain medication," muscle relaxers, and Ibuprofen. (Tr. 37). Specifically, Plaintiff testified that after the accident he took the following medications for his symptoms: Oxycodone (Percocet), Hydrocodone, Ibuprofen,

Butalbital-APAP, and Selaxin. (Tr. 37, 158). Those medications make him feel drowsy, but he claims that he has difficulty sleeping because of the pain caused by his symptoms. (Tr. 37-38). For example, he testified that he generally wakes up between 3:00 and 5:00 a.m. (Tr. 38).

Plaintiff also complained that he experiences "sharp" pain that radiates along both sides of his legs. (Tr. 39-40). On a scale of one to ten (where ten indicates significant pain and one indicates less severe pain), Plaintiff rates the pain in his body as an eight or nine, and claims that he suffers occasional numbness in his legs. (Tr. 39). On at least one occasion, the numbness in his leg caused him to fall to the floor. (Tr. 40). He testified that he uses a cane to relieve tension in his back. (Id.). Cold damp weather causes Plaintiff to experience pain throughout his entire body, and he claims that he experiences severe headaches when the pain in other parts of his body increases. He generally experiences headaches three days each week, and each headache generally lasts for four to five hours. (Tr. 42).

Plaintiff described the following physical limitations. He claimed that he can sit for fifteen to twenty minutes, stand for twenty minutes, and walk for fifteen to twenty minutes before he begins to experience pain. (Tr. 43). He also testified that grabbing a gallon of milk "a certain way" causes him pain, and that he has difficulty bending and putting on shoes. (Tr. 44). In addition, Plaintiff complained of difficulty concentrating. Specifically, he stated that he could not "maintain attention or concentration for up to two hours straight." (Tr. 45). Furthermore, Plaintiff testified that he can no longer cook, shop for groceries, or socialize with friends. (Tr. 46). Plaintiff also testified that he is licensed to drive a motor vehicle, but stated that he did not drive a vehicle between August 26, 2004 and the hearing before the ALJ. (Tr. 49).

## C. Medical Examinations

Plaintiff underwent a variety of medical examinations between August 2006 and March 2007. On April 24, 2004, Dr. Raymond Malta examined Plaintiff at the South Jersey Emergency Department following a motor vehicle accident. (Tr. 159-63). Dr. Malta diagnosed Plaintiff with a left trapezius strain, and prescribed 800 mg of Motrin and 10 mg of Flexeril, and discharged him from the hospital. (Id.).

Dr. Jeff Contino, a chiropractor, treated Plaintiff from April 28, 2004 to December 9, 2004, and again from July 27, 2006 to January 19, 2007. (Tr. 184-90, 220-43). During April and May 2004, Plaintiff complained of pain in his neck, upper arm, hand, and left trapezius. (Tr. 190). Dr. Contino ordered an MRI of Plaintiff's neck and back. On June 9, 2004, Plaintiff underwent a cervical and lumbar MRI. The cervical MRI was negative. (Tr. 165). Specifically, the cervical MRI revealed: (1) no fracture; (2) no herniated disc material; and (3) no inherent abnormality in the cervical cord. (Id.). The MRI of Plaintiff's lumbar spine revealed: (1) "[m]ild disc bulging . . . at L3-4"; (2) "[c]entral disc hernation impinging upon the thecal sac and nerve roots at L4-5"; and (3) "[c]entral disc hernation . . . at L5-S1 impinging upon the thecal sac and nerve roots." (Tr. 164).

On June 14 and June 21, 2004, Dr. Contino reported that Plaintiff suffered from sudden leg pains. (Tr. 189). Dr. Contino also reported that Plaintiff "tried lite [sic] bench press to try to get back to work." (Id.). On December 1, 2004, Dr. Contino noted that Plaintiff's condition improved with abdominal strengthening exercises. (Tr. 184). One week later, Dr. Contino noted that standing and bending over a sink caused Plaintiff pain. (Id.). Dr. Contino also noted that working at a hair salon caused Plaintiff pain. (Id.).

4

Dr. Contino referred Plaintiff to Dr. Ronald Brody, a physical medicine specialist, for additional treatment.  Dr. Brody first examined Plaintiff on May 4, 2004, prior to Plaintiff's cervical and lumbar MRI.  Dr. Brody reported that Plaintiff did not display any signs of acute distress.  (Tr. 204).  In addition, Dr. Brody noted "spasm and tenderness through the cervical region across to [Plaintiff's] left shoulder," and "restricted movement along [Plaintiff's] spine with good to good minus strength."  (Id.).  Plaintiff's "[r]eflexes [were] symmetrical and full," his "gait pattern [was] stable," and he successfully completed a "toe/heel gait."  (Id.).

After examining Plaintiff, Dr. Brody diagnosed him with (1) "[a]cute cervical sprain and strain"; (2) "[a]cute thoracolumbar sprain and strain"; (3) "[l]eft shoulder girdle sprain and strain with tenosynovitis"; (4) "[m]yofascitis"; and (5) "[t]ension headaches," and prescribed Flexeril and Ultracet.  (Tr. 204).  Based upon his examination of Plaintiff's physical limitations, Dr. Brody recommended that Plaintiff "refrain from exertional activity . . . outside the light category," and "avoid sitting for more than 2 hours at any one time."  (Id.).  Moreover, Dr. Brody noted that Plaintiff "should continue with chiropractic care to facilite mobility," and "follow a stretching program several times a day."  (Tr. 204-205).  Finally, Dr. Brody stated that Plaintiff "can also be started on isometric exercises and should be following wall-walking exercises," and noted that after Plaintiff could complete those exercises, he "[could] progress to an isotonic exercise program."  (Tr. 205).

On July 1, 2004, Dr. John Yulo, a licensed physical therapist, examined Plaintiff at the direction of Dr. Brody.  (Tr. 201).  Dr. Yulo reported "tenderness at the bilateral L4, L5, and S1 level paraspinals as well as some mild tenderness at the bilateral shoulder rotator cuff area."  (Id.).  Plaintiff's cervical spine range of motion was "within full limits with normal strength," and his "[l]umbar spine range of motion [was] restricted to about 70% normal, with normal

5

strength." (Id.). Dr. Yulo also reported that Plaintiff's "[b]ilateral upper and lower extremity strength [were] within normal limits with normal range of motion." (Id.). Finally, the ALJ reported that Plaintiff had a "normal gait" and "good balance." (Id.). Based upon his examination, Dr. Brody diagnosed Plaintiff with (1) "[p]ost-traumatic cephalgia"; (2) "[a]cute cervical/lumbosacral sprain and strain"; and (3) "[a]cute myofascitis," and prescribed Vicoprofen. (Id.).

Dr. Brody examined Plaintiff again on August 3, 2004. During that examination, Plaintiff exhibited "fairly good" range of motion in the spinal area and "good strength." (Tr. 199). Plaintiff's joints were "intact," and his "gait pattern and balance [were] stable." (Id.). Once again, Dr. Brody recommended that Plaintiff should "avoid any exertional activity over the light category," and "continue to limit his sitting time." (Tr. 200). Dr. Brody diagnosed Plaintiff with (1) "[s]ubacute cervical sprain and strain"; (2) "[s]ubacute thracolumbar sprain and strain"; (3) "[m]yofascitis with trigger points"; (4) "[t]ension headach[es]"; and (5) "[l]umbrosacral radiculopathy," injected Plaintiff's neck and back with Kenalog, and prescribed Vicodin HP for pain. (Tr. 199). Finally, Dr. Brody reported that Plaintiff could begin "isometric exercises . . . for the cervical, lumbosacral, and abdominal regions . . . ." (Tr. 200).

Plaintiff visited Dr. Brody again on October 26, 2004. During that examination, Plaintiff reported that his level of pain was a 5 ½ out of 10, and that he attended chiropractic sessions once per week, and practiced a home exercise program. (Tr. 197). Based upon his examination, Dr. Brody reported that Plaintiff had "fairly good movement in the cervical region with good strength." (Id.). Dr. Brody also reported "no evidence of instability in any of the joints" and noted that Plaintiff's sensation and reflexes were intact, and he exhibited a normal gait pattern. (Id.). Dr. Brody diagnosed Plaintiff with chronic cervical sprain and strain, chronic lumbosacral

strain and sprain, myofascitis, lumbrosacral radiculopathy, cervical radiculopathy, herniated nucleus pulposus at L5-S1 with impairment of the thecal sac and nerve roots.  (Id.).

Dr. Nithyashuba Khona, a state agency medical consultant, conducted an orthopedic consultative examination of Plaintiff on October 8, 2004.  At the time of the examination, Plaintiff stood 6'1" tall and weighed 210 pounds, and appeared to be in "no acute distress."  (Tr. 169).  Dr. Khona noted that Plaintiff's gait was normal, he could walk on both heels and toes without difficulty, and perform a full squat.  (Id.).  Plaintiff also could rise from a chair without difficulty and did not need assistance changing his clothes for the exam or getting on and off the examination table.  (Id.).  Dr. Khona also noted that Plaintiff's hand and finger dexterity were intact, and his grip strength was 5/5 bilaterally.  (Id.).  With regard to the cervical spine, Plaintiff demonstrated full flexion, extension, lateral flexion, and rotary movements bilaterally.  (Id.).  In addition, Plaintiff demonstrated no cervical or paracervical pain or spasms, and no "trigger points."  (Id.).

Plaintiff also exhibited no significant limitations in his upper extremities.  He demonstrated full range of motion in his shoulders, elbows, forearms, and wrists bilaterally, and no joint inflammation, effusion, or instability.  (Id.).  His strength was 5/5 in proximal and distal muscles, and he exhibited no sensory abnormality.  (Id.).  Plaintiff's lumbar and thoracic spines exhibited full flexion, extension, lateral flexion, and rotary movements bilaterally.  (Tr. 170).  With regard to his lower extremities, Plaintiff exhibited full range of motion in the hips, knees, and ankles bilaterally.  (Id.).  His strength was 5/5 in proximal and distal muscles bilaterally, and he exhibited no muscle atrophy or sensory abnormality.  (Id.).  Finally, Plaintiff demonstrated no joint effusion, inflammation or instability.  (Id.).

Based upon his examination, Dr. Khona diagnosed Plaintiff with chronic low back pain, and lumbar sprain or strain syndrome. (Id.). X-rays of Plaintiff's lumbar spine revealed minimal degenerative disease and no evidence of osseous abnormality in the cervical spine. (Tr. 170). X-rays of Plaintiff revealed no evidence of osseous abnormality. Ultimately, Dr. Khona gave Plaintiff a prognosis of "fair." (Tr. 170).

Dr. Brody re-examined Plaintiff again on January 25, 2005. (Tr. 191). During that examination, Plaintiff's sensation was intact, and his gait and balance were stable. (Tr. 191). However, Dr. Brody found that Plaintiff exhibited a "herniated nucleus pulposus at L5-S1 impinging upon the nerve roots." (Tr. 191). Dr. Brody recommended "a regular stretching program, as well as a home exercise program to strengthen the abdominal . . . region[]," "deep muscle massage[s]," and "trigger point injections." (Id. 192).

Dr. Henry Greenwood, a neurosurgeon, examined Plaintiff on August 24, 2005. (Tr. 182). In his medical report, Dr. Greenwood stated: "I reviewed an MR of [Plaintiff's] lumbar spine. There are two dessicated discs at L4-5 and L5-S1 with a broad herniation at L4-5 and a midline herniation at L5-S1. The upper disc is more to the right side. In addition, he has a congenitally small spinal canal." (Id.). However, Dr. Greenwood also observed that Plaintiff walked with a normal gait and could "support himself on his heels and toes without difficulty." (Id.). Plaintiff's "patellar and Achilles reflexes were intact and symmetric," he exhibited "no focal weakness of any muscle group in either lower extremity," and his sensation was intact. (Id.). Moreover, Plaintiff exhibited full range of motion in his cervical spine, and he had "good strength and muscle bulk in all muscle groups of both upper extremities." (Tr. 183). Dr. Greenwood recommended treatment with pain management and a course of epidural steroids. (Id.).

Dr. Robert Beitman examined Plaintiff on August 25, 2005.  (Tr. 214-15).  Dr. Beitman reported that Plaintiff could heal and toe walk without difficulty and "get up from a squatting position."  (Tr. 215).  Plaintiff's straight leg raise test was negative bilaterally.  (Id.).  However, Plaintiff demonstrated "limited flexion and extension of the trunk, as well as the cervical spine," and "limited . . . range of motion of the lumbar spine."  (Id.).  Based upon his examination, Dr. Beitman diagnosed Plaintiff with herniated lumbar disc and cervical neck pain, and scheduled Plaintiff to receive lumbar epidural treatments.  (Id.).

Plaintiff received epidural treatment from Dr. Morris Antebi from September 2005 to February 2006.  (Tr. 206-13).  On October 20, 2005, during a follow-up evaluation after Plaintiff's first epidural injection, Dr. Antebi reported that Plaintiff had "equal strength and sensation bilaterally," and noted "no neurological defects."  (Tr. 212).  Dr. Antebi also noted that Plaintiff experienced a "20% relief" from his pain as a result of the first epidural injection.  (Id.).  Dr. Antebi diagnosed Plaintiff with lumbar discogenic disease, cervical neck pain, and muscle pain.  (Id.).  A follow-up evaluation on November 21, 2005 produced similar results, with the exception that Dr. Antebi noted that Plaintiff demonstrated "equal strong hand grasps to the upper extremities."  (Tr. 211).

During another follow-up evaluation on December 22, 2005, Dr. Antebi reported that Plaintiff experienced "50% relief of his pain with epidural injection[s]."  (Tr. 209).  Dr. Antebi also noted that Plaintiff experienced pain and tenderness in the lumbar spine and paraspinal muscles bilaterally.  (Id.).  However, Dr. Antebi reported that Plaintiff's straight leg raise was negative bilaterally, and noted no "neurological deficits."  (Id.).  Moreover, Dr. Antebi reported "equal strength and sensation bilaterally."  (Id.).  Based upon his observations, Dr. Antebi diagnosed Plaintiff with lumbar discogenic disease and muscle-related pain in the neck.

9

Dr. Antebi also examined Plaintiff on January 26 and February 28, 2006. (Tr. 206-207). During those examinations, Dr. Antebi reported that the epidural injections provided Plaintiff with 50% pain relief for two-to-three day periods, but noted that the pain generally returned. (Id.). In addition, both reports indicated that Plaintiff experienced pain in the lumbar spine and paraspinal muscles bilaterally, but noted that results of a straight raising test were negative. (Id.). Dr. Antebi diagnosed Plaintiff with lumbar diskogenic disease and myalgia in the neck area and recommended that Plaintiff undergo a lumbar diskography. (Id.).

Plaintiff underwent examinations at Community Health Care from August 2005 to May 2006. (Tr. 216-19). On August 31, 2005, an examiner noted that Plaintiff stood 6'1" and weighed approximately 299 pounds. (Tr. 218). However, the examiner noted that Plaintiff was "well-appearing." (Tr. 219). During a visit on October 14, 2005, Plaintiff weighed 299 pounds. (Tr. 215). However, during that visit, Plaintiff had no complaints of pain or injury, but instead came to the health care center in order to complete a form necessary for him to complete training as a barber. (Tr. 217). During a visit to Community Health Care on May 10, 2006, Plaintiff weighed 312 pounds. (Tr. 216). However, once again, Plaintiff came to the health care center in order to complete another form for beautician school. (Id.).

Dr. Contino examined Plaintiff again on July 27 and 28, 2006. (Tr. 241, 2423). During those examinations, Dr. Costino asked Plaintiff what activities aggravate his symptoms. (Tr. 241). Plaintiff responded that he experiences pain when he "bends, drives, sits, stands up, travels and is at work." (Id.). During an examination on August 4, 2006, Plaintiff informed Dr. Contino that riding a bicycle aggravates his pain. (Tr. 240). Between August 7, 2006 and January 19, 2007, Plaintiff again reported that his problems were aggravated when he drove, sat, and while he was "at work." (Tr. 222, 224, 226, 228, 230-38). Plaintiff also reported that he was

performing all of his rehabilitative exercises on a consistent basis, including lower postural stretching and crunches. (Tr. 220, 222, 224, 226, 228, 230-38, 240-41, 243).

### D. The Vocational Expert's Testimony

During the hearing on March 1, 2007, the ALJ asked a series of questions concerning a hypothetical worker's suitability for work in the national economy if that worker had Plaintiff's physical limitations. The ALJ described the hypothetical worker as a thirty-eight year old individual with a high school education who could: (1) sit for no more than one hour at a time and a total of six hours during an eight-hour workday; (2) stand for no more than twenty minutes at a time and a total of two hours during an eight-hour workday; (3) walk for no more than twenty minutes at a time, and no more than two hours out of an eight-hour workday; (4) lift and/or carry ten pounds on an occasional basis and less than ten pounds on a frequent basis; and (5) occasionally climb stairs. (Tr. 54). However, the ALJ noted that the individual could perform only job tasks that required bending and stooping on an occasional basis, and could never climb ladders, kneel, or crawl. (Id.).

The ALJ replied that an individual with those limitations could not perform the work Plaintiff performed prior to the alleged onset of his disability. (Id.). However, the vocational expert stated that an individual with those limitations could perform other work that exists in the regional and national economy. (Id.). Specifically, the vocational expert stated that an individual with Plaintiff's medical history could perform the work of an addresser, a call-out operator, and a weight-tester, and stated that those jobs were readily available in the regional and national economy (addresser – 1,300 jobs in the region and 575,000 in the national economy; call-out operator – 500 jobs and 320,000 jobs respectively; weight tester – 1,600 jobs and 800,000 jobs respectively).

### E. The ALJ's Findings

The ALJ conducted a thorough review of the record and determined that Plaintiff was not disabled from August 18, 2004 through April 24, 2007, within the meaning of the Social Security Act. (Tr. 21). In reaching that conclusion, the ALJ made the following findings. First, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2009. (Tr. 15). Second, the ALJ found that Plaintiff had the following severe impairments: "status post motor vehicle accident; herniated discs; and lumbar radiculopathy." (Id.). Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1. (Id.). Fourth, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to "lift/carry weights of less than 10 pounds frequently and 10 pounds occasionally; stand for a total of 2 hours, in an 8 hour work day, in 20 minute intervals; walk for a total of 2 hours, in an 8 hour work day, in 20 minute intervals; sit for a total of 6 hours, in an 8 hour work day, in 1 hour intervals; occasionally climb stairs, balance, bend/stoop; but never climb ladders." (Id.). Fifth, the ALJ found that Plaintiff was unable to perform past relevant work. (Id.). Specifically, the ALJ found that Plaintiff could no longer perform work that was "medium to heavy in exertional demands" and "unskilled to semi-skilled in nature." (Id.). Finally, the ALJ found that, notwithstanding his physical impairments, Plaintiff could perform other jobs in the national economy. (Tr. 20).

## II.     STANDARD

District court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). Substantial evidence is "'more than a mere scintilla.

It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).  If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently." Fargnoli v. Masanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d at 360).  The district court may not weigh the evidence "or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.").  The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict. Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) ("Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.") (quoting Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)).  Furthermore, evidence is not substantial if it constitutes "not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114).

## III.   DISCUSSION

In order to qualify for SSI benefits, a claimant must establish that he is aged, blind or disabled.  42 U.S.C. § 1381a.  To qualify for DBI, a claimant must establish that he is disabled.  42 U.S.C. § 423(a)(1)(E).  A claimant is disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairment(s) must prevent him not only from doing his previous work, but also from "engage[ing] in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Commissioner conducts a five-step inquiry to determine whether a claimant is disabled.  20 C.F.R. § 404.1520; Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  The Commissioner first evaluates whether the claimant is currently engaging in a "substantial gainful activity."  Such activity bars the receipt of benefits.  20 C.F.R. § 404.1520(a).  The Commissioner then ascertains whether the claimant is suffering from a severe impairment, meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the Commissioner finds that the claimant's condition is severe, the Commissioner determines whether it meets or equals a listed impairment.  20 C.F.R. § 404.1520(d).  If the condition is equivalent to a listed impairment, the claimant is entitled to benefits; if not, the Commissioner continues to step four to evaluate the claimant's RFC and analyze whether the RFC would enable the claimant to return to his "past relevant work."  20 C.F.R. § 404.1520(e).  The ability to return to past relevant work precludes a finding of disability.  If the Commissioner finds the claimant

unable to resume past relevant work, the burden shifts to the Commissioner to demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy." Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)).

Plaintiff argues that the ALJ erred by relying on the reports of Dr. Khona, and the RFC assessment produced by an unnamed state physician. (Pl.'s Br. at 22). Plaintiff argues that those reports are not entitled to great weight because neither Dr. Khona nor the unnamed state physician had access to all of Plaintiff's medical documentation at the time they assessed Plaintiff's condition. (Id.). Specifically, Plaintiff asserts that Dr. Khona did not examine the record of the MRI Plaintiff received in June 2004, (Tr. 164), and the results of EMG and nerve conduction studies. Plaintiff also argues that Dr. Khona and the unnamed state physician did not consider the fact that Plaintiff received epidural injections. In response, the Commissioner argues that the ALJ correctly relied upon the totality of the medical evidence in determining whether Plaintiff was disabled, not just the reports of state consultants. (Def.'s Br. at 11-12). Specifically, the Commissioner contends that although the ALJ "found the state consultants provided a reasonable assessment of Plaintiff's abilities," the ALJ also relied on reports from other treating sources that had knowledge of Plaintiff's MRI and EMG test results. In particular, the Commissioner highlights the fact that the ALJ expressly referred to the reports of Dr. Brody, Dr. Greenwood, Dr. Antebi, and Dr. Breitman in his opinion, and claims that those reports support the ALJ decision regarding Plaintiff's disability status. (Id. at 12).

The Court finds that the ALJ committed reversible error by relying on the opinion of an unidentified state physician in determining Plaintiff's RFC. Generally, an ALJ may give weight to the opinions of non-examining state physicians when the administrative record supports those opinions. See Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991) (noting that an ALJ may

consider opinions of non-examining state agency physicians when those opinions contradict the opinions of treating physicians). However, where the signature of a state agency physician is illegible, and the "qualifications of [the] physician do not appear in the record," the ALJ may accord no weight to the physician's opinion.[1] Bryant v. Schweiker, 537 F. Supp. 1 (E.D. Pa. 1982); Cannon v. Heckler, 627 F. Supp. 1370, 1375 (D.N.J. 1986) ("Since the [non-examining physician's] signature is illegible and the name and qualifications of the physician unknown, the form should have been given no weight.") (internal citations omitted). Thus, if the ALJ relied on

---

[1] Generally, an ALJ may consider the report of a non-medical source in determining whether the plaintiff is disabled within the meaning of the Social Security Act. See Caruso v. Comm'r of Soc. Sec., 99 F. App'x 376, 380 n.5 (3d Cir. 2004) ("Although [the court] generally prefers reports from physicians, the ALJ may rely upon the opinions of [a non-acceptable medical source] to ascertain the severity of a claimant's impairments."). The ALJ may also consider the report of a non-acceptable medical source "insofar as it is deemed relevant to assessing a claimant's disability." Rios v. Barnhart, 57 F. App'x 99, 101 n.2 (3d Cir. 2003) (quoting Hartranft v. Apfel, 181 F.3d 358, 361 (3d 1999)). However, the ALJ's determination as to whether a source is an acceptable medical source, a non-acceptable medical source, or a non-medical source is critical to the ALJ's assessment of how much weight to give the opinion of that source. The following passage in Social Security Ruling 06-3p is illustrative:

> The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" because . . . "acceptable medical sources" "are the most qualified health care professionals." However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source.

With respect to the opinion of a "non-medical source," Social Security Ruling 06-3p provides:

> For opinions from sources such as teachers, counselors, and social workers who are not medical sources, and other non-medical professionals, it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion . . . and any other factors that tend to support or refute the opinion.

(emphasis added). Where, as here, the name and qualifications of a source do not appear in the administrative record, the ALJ (and the District Court reviewing the ALJ's decision) cannot determine how to apply the factors articulated in Social Security Ruling 06-3p to the disputed medical report.

Moreover, the Court cannot determine whether the ALJ erred by according great weight to the report of an unknown official despite contrary evidence in the administrative record. In particular, the Court cannot determine whether the ALJ erred by rejecting Dr. Contino's determination that Plaintiff should not sit for more than two hours in one eight-hour workday, (Tr. 245), and accepting the unknown official's determination that Plaintiff can sit for six hours in one eight-hour workday.

a medical report from an unknown official, the Court may vacate the ALJ's opinion and remand the matter.

Here, the ALJ refers to a document entitled "Physical Residual Functional Capacity Assessment" (the "RFC Assessment Form") dated November 2, 2004. (Tr. 174-81). The RFC Assessment Form contains the illegible signature of a state agency official, and no description of that official's medical qualifications. The official who signed the form determined that Plaintiff had the RFC necessary to: (1) occasionally lift and/or carry 50 pounds; (2) frequently lift and/or carry 25 pounds; (3) stand and/or walk (with normal breaks) for a total of 6 hours in an 8 hour workday; (4) <u>sit (with normal breaks) for a total of 6 hours in an 8 hour workday</u>; and (5) climb, balance, stoop, kneel, crouch and crawl frequently. (Tr. 174-76). In the ALJ's written opinion, he concluded that Plaintiff had the RFC to: "lift/carry weights of less than 10 pounds frequently and 10 pounds occasionally; stand for a total of 2 hours, in an 8 hour workday, in 20 minute intervals; walk for a total of 2 hours, in an 8 hour workday, in 20 minute intervals; <u>sit for a total of 6 hours, in an 8 hour workday</u>, in 1 hour intervals; occasionally climb stairs, balance bend/stoop; but never climb ladders." (Tr. 15) (emphasis added). The Commissioner does not point to any medical evidence in the administrative record which suggests that Plaintiff can sit for a total of six hours during an eight-hour workday, and the Court's independent review of the record reveals no evidence that Plaintiff can sit for six hours in an eight-hour workday. Thus, it appears that the ALJ relied on the unnamed official's determination that Plaintiff had the RFC to sit for six hours during an eight-hour workday. That determination was erroneous for the following reasons.

First, the absence of any medical evidence supporting the ALJ's determination alone compels remand. See <u>Ruiz v. Comm'r of Soc. Sec.</u>, No. 10-4024, 2011 WL 2745927, at *5

(D.N.J. July 12, 2011) (noting that district court must "'scrutinize the record as a whole to determine whether the conclusions reached are rational' and supported by substantial evidence.") (quoting Grober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)).  Second, and perhaps more importantly, the reports and treatment notes of two physicians in the administrative record appear to conflict with the ALJ's determination that Plaintiff could sit for a total of six hours during an eight-hour workday.  In May 2004, Dr. Brody, Plaintiff's treating physician, determined that Plaintiff should "avoid sitting for more than 2 hours at any one time."  (Tr. 204).  Thereafter, in August 2004, Dr. Brody noted that Plaintiff should "continue to limit his sitting time."  (Tr. 200).  Dr. Contino also made a similar recommendation.  In February 2007, Dr. Contino noted that Plaintiff should sit for no more than one hour continuously, and less than two hours during the course of an eight-hour workday.  (Tr. 245).  Those opinions do not support the ALJ's determination that Plaintiff could sit for six hours during an eight-hour workday.

The absence of evidence supporting the ALJ's determination that Plaintiff could sit for six hours during an eight-hour workday is particularly critical because the ALJ determined that Plaintiff could find work in the national economy based upon the vocational expert's testimony.  (Tr. 20-21).  However, the vocational expert testified that an individual with Plaintiff's physical restrictions could find employment in the national economy based upon the ALJ's description of a hypothetical worker who could sit for six hours during an eight-hour workday.  (Tr. 54).  Thus, if the ALJ described an individual who cannot sit for a total of six hours during an eight hour workday, it is unclear whether the vocational expert would have reached the same conclusion.

Furthermore, to the extent that the ALJ's hypothetical question to the vocational expert did not reflect the severity of Plaintiff's condition, the ALJ may not rely on the vocational expert's response.  In determining the severity of a claimant's alleged disability, an ALJ may

rely on the response of a vocational expert to a hypothetical question posed by the ALJ. Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).  However, "a hypothetical question must reflect all of a claimant's impairments that are supported by the record." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).  If a hypothetical question does not reflect all of the claimant's impairments, "the question is deficient and the expert's answer cannot be considered substantial evidence." Id. (citing Podedworny, 745 F.2d 210; Wallace v. Secretary, 722 F.2d 1150 (3d Cir. 1983)).  Here, the hypothetical question the ALJ posed to the vocational expert described an individual who could sit for six hours during an eight-hour workday. Because the record does not support that description of Plaintiff's physical restrictions, the vocational expert's response does not constitute substantial evidence.

Therefore, because substantial evidence does not support the ALJ's determination that Plaintiff had the RFC necessary to sit for six hours during an eight-hour workday, the Court finds that remand is appropriate.[2]

## IV.  CONCLUSION

For the reasons discussed above, the Court finds that substantial evidence does not support the ALJ's determination that Plaintiff is not entitled to SSI and DBI.  As a result, the Court will vacate the ALJ's decision and remand the matter to the ALJ for further proceedings consistent with this Opinion.  An appropriate order shall enter today.

Dated:  8/19/2011                                         /s/ Robert B. Kugler
                                                          ROBERT B. KUGLER
                                                          United States District Judge

---

[2] The Court notes that Plaintiff challenged the Commissioner's decision to deny Plaintiff benefits on other substantive grounds.  However, because the Court remands the matter to the ALJ for review of Plaintiff's DBI and SSI claims, the Court will not address those arguments.  If, after reviewing Plaintiff's claim for disability benefits on remand, the ALJ alters his assessment of Plaintiff's RFC, or otherwise amends his original written opinion, Plaintiff's other substantive arguments may become moot.  Therefore, the Court will not address Plaintiff's other arguments in the present appeal.